UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



07 CV 0519

———————————————————————— x

GVA MARKET NEUTRAL MASTER LIMITED,

      Plaintiff,

  -against-

VERAS CAPITAL PARTNERS OFFSHORE
FUND, LTD., VERAS INVESTMENT PARTNERS, LLC,
VERAS INVESTMENT GROUP, LP, KEVIN D. LARSON,
and JAMES R. McBRIDE,

      Defendants,

and, as a Derivative Action, on behalf of

VERAS CAPITAL PARTNERS OFFSHORE
FUND, LTD., VERAS CAPITAL MASTER FUND,

      Nominal Defendants,

  -against-

KEVIN D. LARSON, JAMES R. McBRIDE, VERAS
INVESTMENT PARTNERS, LLC, and VERAS
INVESTMENT GROUP, LP

      Derivative Defendants.

———————————————————————— x

Civil Action No.

COMPLAINT

   Plaintiff, by its attorneys, Nixon Peabody LLP, for its complaint herein, alleges as

follows:

## INTRODUCTION

1.     This is an action by GVA Market Neutral Master Limited ("Gottex")[1] for in excess of $1.5 million dollars in damages and for rescission and equitable relief for violations of §10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 thereunder, violations of the Texas Securities Act, fraud and misrepresentation, and breaches of fiduciary duty, arising out of material misrepresentations and omissions by Veras Capital Partners Offshore Fund, Ltd. ("Veras Offshore"), Veras Investment Partners, LLC ("VIP"), Veras Investment Group, LP ("VIG"), and the principals of VIP and VIG, Kevin D. Larson ("Larson") and James R. McBride ("McBride") in connection with selling securities in Veras Offshore, which was a "feeder fund" into Veras Capital Master Fund ("VCM").

2.     The United States Securities Exchange Commission ("SEC") and New York Attorney General ("NYAG") found that VCM, VIP, Larson and McBride engaged in illegal late trading of mutual funds and used deceptive methods to "market time" mutual funds.  In connection with such findings by the SEC and NYAG, VCM, VIP, Larson and McBride agreed to pay over $36 million jointly and severally to settle claims by the SEC and NYAG in December 2005.  Larson and McBride also agreed to each pay $750,000 in penalties in connection with the SEC and NYAG findings.  Also in December 2005, the Commodity Futures Trading Commission ("CFTC") found that VIP, Larson and McBride engaged in illegal late trading of mutual funds, used deceptive methods to "market time" mutual funds, and operated a fraud or deceit upon investors by failing to disclose to those investors that VIP used deceptive and illegal practices to execute its "market timing" strategies.  In connection with the CFTC findings, VIP, Larson, and McBride each agreed to pay a $500,000 penalty.

---

[1] "GVA" stands for "Gottex Value Added"

3.     When the Defendants sold securities in Veras Offshore to Gottex, and subsequently, they concealed that VIP, Larson, McBride and VCM (the "master fund" that VIP managed and into which Veras Offshore fed) were engaged in the illegal conduct alleged herein, and indeed falsely stated they were not engaged in such illegal conduct. The Defendants' concealment of their illegal conduct, and the consequent payments to the SEC, directly caused the damages suffered by Gottex.

4.     This action is also brought derivatively on behalf of Veras Offshore (for the benefit of Veras Offshore and, as general partner of VCM, for the benefit of VCM) against Larson, McBride, VIP and VIG for breaches of fiduciary duty in connection with the payment of $36.2 million dollars to an SEC fair fund to settle claims of illegal late trading and improper market timing. Even though Larson, McBride, VIP, VCM and another Veras fund were jointly and severally liable for such payment in accordance with the provisions of the settlement with the SEC and NYAG, nonetheless Larson, McBride, and VIP failed to pay any portion of that settlement out of their own pockets, (and VIP/VIG as managers of Veras Offshore failed to cause that to happen), in breach of their fiduciary duties to VCM and Veras Offshore.

5.     This action is also brought directly by Gottex against Larson and McBride as directors of Veras Offshore and against VIP/VIG as managers of Veras Offshore for breach of fiduciary duty in connection with the decision to allocate the costs of the settlement  payment across interest holders in Veras Offshore pro rata in proportion to the size of each interest holder's interest in the fund rather than based upon the amount of the profits accrued to each interest holder.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction of this action pursuant to Section 27 of the Securities

Exchange Act of 1934 (the "Exchange Act"), because the claims asserted herein arise under and

pursuant to Section 10(b) of the Exchange Act, and 28 U.S.C. § 1331.  The Court has jurisdiction

of Plaintiffs' state law claims under 28 U.S.C. § 1367.

7.     Venue is proper in this judicial district (i) pursuant to 15 U.S.C. § 78aa, because

Defendants transacted business in this federal judicial district and because the acts or

transactions constituting the violations occurred in this federal judicial district and (ii) under 28

U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims

occurred in this federal judicial district, and because certain of the Defendants are aliens.

## PARTIES

8.     Plaintiff GVA Market Neutral Master Limited ("Gottex") is a British Virgin

Islands International Business Company, whose ultimate, sole beneficial shareholder is Gottex

Value Added Fund Limited ("Gottex VAF"), an investment "fund of funds" that is marketed to

investors.  At the time of Gottex's investment in Veras Offshore, Gottex VAF was managed by

Gottex America Limited, a Bermuda company.  Gottex VAF, thorough its investment manager,

made and makes the investment decisions that are implemented by Gottex's purchases and sales

of securities.  Gottex Fund Management Limited, a Delaware corporation with its principal place

of business in New York, New York, supported Gottex America Limited in connection with its

investment-related activities on behalf of Gottex and Gottex VAF.

9.     Defendant Veras Investment Partners, LLC, ("VIP") is a Texas limited liability

company located in or near Sugar Land, Texas.   It is and has been controlled by Defendants

4

Larson and McBride, who are its members.  At all relevant times, VIP was the investment
manager of VCM and an investment manager of Veras Offshore.

10.    Defendant Kevin D. Larson ("Larson") was at all relevant times a resident of
Texas, and on information and belief resides in or near Sugar Land, Texas.

11.    Defendant James R. McBride ("McBride") was at all relevant times a resident of
Texas, and on information and belief resides in or near Sugar Land, Texas.

12.    Defendant Veras Investment Group, LP ("VIG") is a Texas limited partnership
located in or near Sugar Land, Texas.  It is and has been controlled by Defendants VIP, its
general partner, and Larson and McBride, its limited partners.  At all relevant times, VIG was an
investment manager of Veras Offshore.

13.    Defendant and nominal Defendant Veras Capital Partners Offshore Fund, Ltd.,
("Veras Offshore") is a Cayman Islands Exempted Company with its registered office on Grand
Cayman, Cayman Islands, B.W.I.

14.    Nominal Defendant Veras Capital Master Fund ("VCM") is a Texas Partnership
located in or near Sugar Land, Texas.

<u>TRADING IN MUTUAL FUNDS</u>

15.    Open-end investment companies registered under the Investment Company Act of
1940 ("ICA") are generally called mutual funds.  A mutual fund is a company or a trust through
which many investors pool their monies for collective investment, primarily in securities such as
stocks or bonds.  Each investor in a mutual fund owns shares of that fund, which represent a
partial ownership interest in the fund's portfolio of investments.  Mutual funds issue new shares
to investors, and those shares are "redeemable securities" under the ICA, which generally means

that the fund must redeem the shares upon presentment and pay to the investor approximately the investor's proportionate share of the fund's net assets.

16.    Unlike securities traded in the stock markets, whose value may change throughout the day, shares in mutual funds are priced once a day.  Specifically, under § 22(d) of the ICA, shares in a mutual fund must be sold at a uniform public offering price described in the fund's prospectus.  Under what is known as the "forward pricing" rule, Rule 22c-1 under the ICA, shares in a mutual fund must be sold to investors and redeemed at a price reflecting the net asset value per share ("NAV") of the fund that is next computed after receipt of an order to buy or sell the shares.  Most mutual funds calculate their daily net asset value as of the close of the major United States securities exchanges and markets (normally 4:00 p.m. Eastern Standard Time).

17.    The net asset value computed at the close of the day reflects the values of the underlying securities in the portfolio held by the mutual fund.  But some of those values may be "stale" or otherwise inaccurate.  For example, a mutual fund holding foreign securities may use values for those securities that are based on trading on a market (e.g. in Asia) that has closed many hours earlier.  Such values would not yet reflect the impact of events that had occurred subsequently.  This, and other possible discrepancies in valuation, raise the possibility for "market timing" purchases and sales of mutual fund shares.

<u>MARKET TIMING IN MUTUAL FUNDS</u>

18.    Market timing includes the frequent buying and selling of shares in the same mutual fund in order to benefit from stale prices or other discrepancies in mutual fund share pricing.  Market timing is not illegal.

19.    However, many mutual fund companies believe that excessive market timing can be harmful to existing, long-term mutual fund investors because it may "dilute" the benefits to

those shareholders and impose increased transaction costs to the funds.  Accordingly, many mutual fund companies restrict the quantity and frequency of market timing in their mutual funds.

## DEFENDANTS SECRETLY USED DECEPTIVE ACTS TO CIRCUMVENT LIMITATIONS ON MARKET TIMING OF MUTUAL FUNDS

20.     VCM and VIP were created by Larson and McBride, who controlled their operations, which were primarily to market time the securities of mutual funds.  At its peak, VIP had more than $1 billion in assets under management.

21.     Veras Offshore was a "feeder fund" which invested substantially all of its assets in VCM.

22.     In the sales documents, the Defendants disclosed that, through investment in VCM, Veras Offshore intended "to exploit mispricings in mutual fund portfolios across a variety of asset classes," and that mispricings are identified through "extensive modeling including holdings-based analysis, measurement of stale pricings and momentum/volatility measurement."

23.     In pursuit of its investment strategies, VCM, managed by VIP, executed a high volume of trades in mutual funds.  Many of the mutual funds in which VCM and VIP traded prohibited market timing or limited significantly the frequency of trading in order to prevent market timing.

24.     Complaints by numerous mutual funds about VCM and VIP's market timing practices began to mount, resulting in the exclusion of VCM and VIP from trading.  To circumvent efforts to exclude VCM and VIP from trading, VIP, Larson and McBride engaged in deceptive acts that enabled their continued market timing in mutual funds.  At no time did any of the Defendants disclose to Gottex that they engaged in such deceptive acts and practices.

25.     For example, VIP, Larson and McBride created new legal entities through which to trade mutual fund shares that did not have "Veras" in their name so as to hide the fact that the trades were being conducted on behalf of VCM and VIP. During the relevant period, VIP, Larson and McBride created eight such entities. Further, VIP, Larson and McBride opened trading accounts for the new entities at multiple brokers. By trading through the new accounts, and by dividing the trades into smaller dollar amounts, VIP, Larson and McBride attempted to avoid detection by the mutual funds. Defendants did not disclose to Gottex that they would engage in such deceptive actions to avoid market timing restrictions.

## LATE TRADING IN MUTUAL FUNDS

26.     "Late trading" is the illegal practice whereby an order to purchase or sell mutual fund shares that in fact is submitted after the U.S. stock market close (4:00 Eastern Standard Time) is treated as eligible for and receives the NAV computed as of the market close. An investor who engages in this practice is therefore not buying and selling shares in the fund at the current public offering price, but rather at the previous day's public offering price (i.e., the price based on the fund's NAV calculated as of the market close before the order was placed), in violation of Rule 22c-1 under the ICA.

27.     Late trading thus allows the trader to use information from market events that occur after 4:00 p.m. Eastern Standard Time, but that are not reflected in that day's price.

## DEFENDANTS' ILLEGAL LATE TRADING IN MUTUAL FUNDS

28.     VIP, VCM, Larson and McBride established late trading arrangements with various broker dealers and two mutual fund companies. Through these arrangements, VCM and VIP regularly placed orders to buy and sell mutual fund shares after 4:00 p.m. Eastern Standard Time, and still received that day's net asset value per share. At times, VCM and VIP late traded

based on information obtained after 4:00 p.m. EST, including information gleaned from the futures markets. In fact, one of VIP's proprietary trading models incorporated information obtained from the futures market to generate a signal to buy or sell.

29.     Defendants did not disclose to Gottex that they had arrangements to late trade mutual fund shares and did late trade mutual fund shares, all in violation of federal securities laws.

> DEFENDANTS WERE ORDERED TO PAY MILLIONS OF DOLLARS
> BY THE SEC, NYAG AND CFTC AS SANCTIONS FOR VIOLATING
> FEDERAL SECURITIES LAWS AND STATE LAW AGAINST FRAUD
> BASED ON VCM AND VIP'S ILLEGAL LATE TRADING
> AND USE OF DECEPTIVE TECHNIQUES IN MARKET TIMING

30.     As Larson subsequently admitted to Gottex, Defendants had known about the NYAG investigation into market timing and late trading well before Gottex made its investments in Veras Offshore. However, at no time prior to Gottex's investments in Veras Offshore in July and August 2003 did Larson or any other Veras representative inform Gottex of the investigation. Indeed, during September 2003 (after the NYAG and SEC investigations became publicized), Larson informed Gottex that Defendants had learned about the NYAG investigation months earlier.

31.     According to a felony complaint for tampering with evidence of late trading filed by a confidential investigator with the Criminal Investigations Bureau of the New York State Attorney General's Office in the matter of People of the State of New York v. James P. Connelly Jr., on August 20, 2003 an Assistant Attorney General served a Subpoena on the mutual fund company Fred Alger & Company, Inc. ("Alger"), with which Veras had a late trading arrangement. Alger has its principal place of business in New York, New York.

32.    After the NYAG Subpoena was served on Alger, on about August 22, 2003, employees within Alger had e-mail communications about "whether an Alger client known as 'Veras' could continue to place trades with Alger as late as 4:30 p.m.," according to the felony complaint. According to the felony complaint, the defendant in that action directed Alger employees to delete e-mails that the Subpoena had called for.

33.    Following its investigation into late trading and deceptive market timing practices by VCM, VIP, Larson and McBride in December 2005, the SEC made extensive findings, including that VCM, VIP, Larson and McBride had engaged in fraudulent market timing and illegal late trading, and that they had willfully violated the anti-fraud provisions of federal securities laws (Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder) and had aided and abetted and caused violations of the federal securities laws prohibiting late trading (Rule 22c-1(a) under the ICA).

34.    The SEC ordered the VCM, VIP, Larson and McBride (and another Veras fund) jointly and severally to pay $35,554,903 in disgorgement and $645,585 in prejudgment interest. In addition, the SEC ordered Larson and McBride each to pay a civil penalty of $750,000, and barred them from serving as investment advisors or working for mutual funds for eighteen months.

35.    The SEC's order that VCM, VIP, Larson and McBride pay millions of dollars in sanctions and penalties was based on the SEC's findings, including:

"This case involves a fraudulent market timing and late trading scheme by two hedge funds, VCM and VEY ("the Veras hedge funds"), their investment adviser, VIP, and its fund traders, Larson and McBride. From January 2002 through September 2003 ("the relevant time"), [VCM, VIP, Larson and McBride] used deceptive techniques to continue

10

market timing in mutual funds that previously had detected and restricted, or that otherwise would not have permitted, the Veras hedge funds' trading. During the relevant time, [VCM, VIP, Larson and McBride] also traded mutual fund shares after 4:00 p.m. Eastern Time ("ET") and received the same day's price. By virtue of their conduct, [VCM, VIP, Larson and McBride] caused violations of and willfully violated and aided and abetted violations of the antifraud and mutual fund pricing provisions of the federal securities laws."

36.     The SEC also found: "To evade the mutual funds' trading restrictions, [VCM, VIP, Larson and McBride] employed deceptive techniques to hide the identity of the Veras hedge funds from the mutual funds in which they traded. One such deceptive technique was the creation of legal entities with names unrelated to 'Veras.' During the relevant time, Larson and McBride created eight such entities." "During the relevant time, [VCM, VIP, Larson and McBride] used these entities to open multiple accounts at multiple broker dealers. [VCM, VIP, Larson and McBride] traded through these accounts to, among other things, evade the restrictions imposed by the mutual funds on trading. [VCM, VIP, Larson and McBride] also used the multiple accounts to divide trades into smaller dollar amounts that would more likely evade detection by the mutual funds."

37.     The SEC concluded in its findings: "[VCM, VIP, Larson and McBride] knew or were reckless in not knowing that their deceptive market timing techniques were fraudulent within the meaning of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder."

38.     With regard to VCM, VIP, Larson and McBride's causing and aiding and abetting illegal late trading, the SEC findings include: "During the relevant time, [VCM, VIP, Larson and

McBride] were permitted to submit late trades to dealers in mutual fund shares and to two mutual fund companies. These entities routinely allowed [VCM, VIP, Larson and McBride] to communicate orders to purchase and sell mutual fund shares after 4:00 p.m. ET at that day's NAV. In some instances, [VCM, VIP, Larson and McBride] communicated orders to these entities before 4:00 p.m. ET and then confirmed, altered, or cancelled the orders after 4:00 p.m. ET. By executing [VCM, VIP, Larson and McBride's] late trades, these entities violated Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Rule 22c-1."

39.     The SEC went on to find: "In some instances, [VCM, VIP, Larson and McBride] used information obtained after 4:00 p.m. ET to make their trading decisions. In fact, one of the Veras hedge funds' proprietary trading models incorporated information obtained from the futures market between 4:00 p.m. ET and 4:15 p.m. ET to generate a signal to buy or sell. Thus, [VCM, VIP, Larson and McBride's] late trading arrangements allowed them to purchase or sell mutual fund shares at prices set as of the market close, such close having occurred before they obtained aftermarket information and made some of their trading decisions."

40.     With respect to such illegal late trading, the SEC concluded in its findings: "[VCM, VIP, Larson and McBride] knew or were reckless in not knowing that the late trading arrangements in which they participated were fraudulent within the meaning of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder."

41.     The SEC found that VCM, VIP, Larson and McBride's violations of the federal anti-fraud provisions were "willful"; and that VCM, VIP, Larson and McBride's aiding and abetting violations of the late trading rules was "willful."

42.     In parallel with the SEC's investigation, the NYAG conducted its own investigation of VCM, VIP, Larson and McBride's deceptive acts in market timing mutual funds and late trading mutual funds. The NYAG made similar findings to those alleged above in paragraphs 35 through 41. It concluded that "The acts and practices of [VCM, VIP, Larson and McBride] described in the Findings violated the Martin Act, Article 23-A of the General Business Law, § 349 of the General Business Law, and § 63(12) of the Executive Law."

43.     The CFTC also conducted an investigation into VCM, VIP, Larson and McBride's deceptive and illegal market timing and late trading strategies. Among other things, the CFTC expressly found, just as Gottex alleges in this action, that VIP, Larson and McBride "failed to disclose illegal and deceptive trading practices to [commodity] pool participants." Based on those findings, the CFTC ordered the VIP, Larson and McBride to pay a civil monetary penalty of $500,000, revoked their registrations, and banned Larson and McBride from trading commodity futures and options for others for 18 months.

44.     As summarized in the CFTC Release dated December 22, 2005, Release No. 5149-05:

> **CFTC Finds that [VIP], Along with Owners and Managing Members James McBride and Kevin Larson, Failed to Disclose Illegal and Deceptive Trading Practices to Pool Participants**
>
> **Order Imposes $500,000 Penalty on [VIP], McBride, and Larson, and Revokes Their Registrations**
> . . .
> According to the CFTC's order, [VIP] operated two primary commodity pools as hedge funds that traded commodity futures contracts and securities. The CFTC's order finds that [VIP], McBride, and Larson each failed to disclose to commodity pool participants certain deceptive and illegal market timing and late trading practices that [VIP] used to execute its securities trading strategies.
>
> The order finds that [VIP] used deceptive techniques to engage in market timing in mutual funds that previously had detected and restricted, or that otherwise would not have permitted, [VIP's] market timing. As also set forth in the order, [VIP] and its

managing members engaged in "late trading," thereby obtaining a trading advantage not available to all investors. According to the order, these practices violated federal securities laws.

The order further finds that [VIP] did not disclose to commodity pool participants that [VIP] would engage in such violative market timing and late trading practices. The order concludes that the failure to disclose such information operated as a fraud or deceit on commodity pool participants in violation of the Commodity Exchange Act (CEA), which prohibits fraud by commodity pool operators and its associated persons.

## DEFENDANTS' MISREPRESENTATIONS AND OMISSIONS

45.     In the spring of 2003, Gottex sought information about VIP and Veras Offshore in connection with a possible investment in Veras Offshore. Defendants provided to Gottex the Private Offering Memorandum with respect to Veras Offshore (hereinafter also referred to as the "Fund") dated January 1, 2003 (the "Offering Memorandum").

46.     The Offering Memorandum states: "The Fund invests primarily in publicly-traded securities, including equities, debt and convertibles, of both domestic and foreign issuers. . . . The Fund's strategies primarily involve the identification and exploitation of mispriced securities, generally due to systemic issues in the market." It explains that "The Investment Manager intends to exploit pricing anomalies and strategies developed through extensive capital market experience and a deep understanding of the pricing of risk in the capital markets." It goes on to state, under the heading "Investment Strategy":

The sustainable advantage of the investment strategy employed by the Investment Manager is the identification of equity and debt securities that are mispriced due to many critical measures of value. The principals understand that this systematic mispricing is not dependent on a market trend or subject to the reversion to a mean that may no longer exist. The strategy is implemented by systematically identifying highly diversified baskets of equities and bonds that are mispriced to a degree that can be measured and captured in a short time period. The short time period is a significant risk mitigant as the mispricing is either reconciled or the trade is closed out. The mispricing is created from the following measurable factors:

1. Funds flow between sectors of the capital market

2. The impact of volume and momentum on price.
3. Information flow to various levels of liquidity in the capital market
4. The effect of artificial time constraints on price (market opens and closes, time zones)
5. Price differentials between identical securities trading on different exchanges
6. The correlation of like industry securities with different liquidity preferences
7. Exchange related inefficiencies (curbs, halted securities, limit up/limit down)

47.     The Offering Memo also states that the Fund's management intended to invest substantially all of the Fund's assets through a "master fund/feeder fund" structure wherein the Fund would invest substantially all of its assets in VCM, which had the same investment objective and policies as the Fund.  In fact, substantially all of the Fund's assets were invested in VCM.

48.     The references to "mispricing", "short time period," and "effect of artificial time constraints on price (market opens and closes, time zones)" may suggest that market timing, which is not illegal, was at least part of VCM's strategy.  However, nowhere in the Offering Memorandum did Defendants reveal that they intended, as part of their strategies, to engage in, and cause mutual funds to engage in, illegal late trading.  Nowhere in the Offering Memorandum did Defendants reveal that they intended, as part of their strategies, to use deceptive means to circumvent mutual funds' restrictions against excessive market timing.

49.     The Offering Memorandum contains an extensive list of "Risk Factors," including such risks as lack of liquidity, lack of prior performance, dependence on the investment managers, market risks, and others.  However, nowhere in the Offering Memorandum did Defendants disclose the very substantial risk that the techniques they used for their investment strategy included unlawful conduct or that their tactic to cause illegal late trading in mutual funds and use deceptive techniques to circumvent mutual funds' restrictions against excessive market timing might be found out by regulators, including the SEC, CFTC, and NYAG.  Nowhere in the Offering Memorandum did Defendants disclose that, if the SEC, CFTC and NYAG caught them,

the Defendants would improperly use Gottex's money to pay the sanctions and penalties that the

SEC, CFTC and NYAG would order Defendants to pay.

50.    As alleged above, the Offering Memorandum touted the "sustainable advantage of

the investment strategy employed by the Investment Manager."  Nowhere did the Offering

Memorandum reveal that the so-called "sustainable advantage" depended on Defendants being

able to continue a strategy of employing and aiding and abetting illegal late trading.  Nowhere

did the Offering Memorandum reveal that the touted advantage was "sustainable" through the

use of fraudulent and deceptive means to evade the mutual funds' restrictions on excessive

market timing.  Defendants never revealed to Gottex that, in effect, if Defendants were caught,

the strategy would halt; or that if Defendants were caught, the SEC, CFTC and NYAG would

impose sanctions and penalties; or that if Defendants were caught, Defendants would improperly

use Gottex's money to pay such sanctions and penalties.

51.    Prior to investing in the Veras funds, Gottex conducted extensive due diligence to

satisfy itself that the investments were appropriate.  Among other things, Gottex sent Defendants

a detailed questionnaire with 77 questions seeking information ranging from the background of

the principals to detailed descriptions of the investment strategy.  Larsen and/or McBride, on

behalf of themselves, VIP, and Veras Offshore, provided Gottex with written responses to the

questions contained in the questionnaire.

52.    For example, when asked in the questionnaire to "Describe in detail the strategy

employed," Defendants responded: "The trading advisor employs a multi-strategy, beta hedged

approach to mutual fund trading.  The alpha is extracted through trading models which

approximate the 'advantage' of holding sector specific mutual funds for a short period of time."

Although the references to "mutual fund trading" and "short period of time" may suggest that

Defendants' strategy entailed market timing, market timing is not itself illegal. However, nowhere in Defendants' responses to Gottex's questions did Defendants reveal that they intended, as part of their strategies, to engage in or cause and aid and abet mutual funds to engage in illegal late trading. Nowhere in Defendants' responses to Gottex's questions did Defendants reveal that they intended, as part of their strategies, to use deceptive means to circumvent mutual funds' restrictions against excessive market timing.

53.    Indeed, Gottex's questionnaire expressly asked: "What are the prospects for the strategy as you see them." In response, Defendants stated: "The future prospects for this strategy remains [sic] strong. Because we trade many different sectors of mutual funds, and because our models tend to transact slower than most of our competitors, our business should continue to be well received by mutual funds and fund brokers."

54.    Defendants failed to disclose, however, that "the future prospects for this strategy" depended entirely on Defendants' defrauding the mutual fund companies and causing and aiding and abetting illegal late trading and upon not getting caught by the mutual funds, the SEC, CFTC, or NYAG.

55.    Defendants failed to disclose that their business in fact was not "well received by mutual funds and fund brokers," and would not "continue to be" so, but rather that they had received, and would likely continue to receive, numerous complaints from mutual funds about VCM, VIP, Larson and McBride's market timing practices that resulted in VCM and VIP being excluded from trading at mutual funds. Defendants failed to disclose that, far from being "well received by mutual funds and fund brokers," Defendants would secretly attempt to circumvent efforts to exclude VCM and VIP from trading, and did and would engage in deceptive acts that enabled their continued market timing.

56.    For example, Defendants failed to disclose that, among other deceptive acts, they created new legal entities that did not have "Veras" in their names, and opened trading accounts for the new entities at multiple brokers.  By trading through the new accounts, and by dividing the trades into smaller dollar amounts, Defendants attempted to avoid detection by the mutual funds.  At no time during the course of Gottex's due diligence or afterwards did Defendants reveal to Gottex that their very strategies depended on using such deceptive actions to avoid market timing restrictions and further depended on not getting caught doing so.

57.    Gottex's due diligence questionnaire asked 16 separate detailed questions to assess the risks of VCM, Veras Offshore and VIP's strategies, including: "What is the biggest risk to the strategy/to the portfolio?"  Defendants responded: "The biggest risk to the strategy is an extreme market event like a stock market crash or terrorist event which causes the US equity market to cease or trade in extreme ways.  We are beta hedged, but such markets can cause large drawdowns even in hedged portfolios."  Nowhere in their responses to the questionnaire, or at any other time during the due diligence process or afterwards, did Defendants reveal to Gottex that there was a severe risk that Defendants would be caught causing illegal late trading as part of their strategies or that they would be caught using deceptive actions to evade market timing restrictions as part of their strategies.

GOTTEX'S PURCHASES OF SHARES IN VERAS OFFSHORE

58.    In reliance on Defendants' statements alleged above, and in reliance on the absence of the material information regarding illegal late trading and deceptive practices alleged above, on or about August 1, 2003, Gottex purchased 1,700 shares of Veras Offshore for $17,000,000.

59.     In further reliance on Defendants' statements alleged above, and in further reliance on the absence of the material information regarding illegal late trading and deceptive practices alleged above, on or about September 1, 2003, Gottex purchased 800 shares of Veras Offshore for $8,000,000.

### DEFENDANTS MADE ADDITIONAL MISREPRESENTATIONS AND OMISSIONS TO GOTTEX TO COVER UP THEIR MISCONDUCT

60.     Gottex monitored its investments in Veras Offshore and continued to perform due diligence regarding those investments.  Among other things, in early September, 2003, J.P. Bailey, a Senior Investment Partner of Gottex VAF's investment manager, telephoned Larson. In that call, Larson told Bailey that Defendants had known that the NYAG had been investigating late trading and market timing at mutual funds for at least three to four months. Larson conceded that Defendants had not previously disclosed this information to Gottex in June or July when Gottex was conducting due diligence before investing in Veras Offshore or in August prior to Gottex's second ($8,000,000) investment in Veras Offshore.

61.     During their call, Larson told Bailey that the NYAG investigation focused on two issues. One was late trading, which Larson said was in direct violation of the ICA.  The other issue, Larson said, was giving kickbacks to the funds in order to secure "capacity" to receive preferential trading terms, which Larson said was outright fraud.

62.     During their call, Larson told Bailey that VCM and VIP did not engage in either of those two practices.

63.     However, in fact Veras had engaged in late trading, as described above. Additionally, In January 2007, the SEC found that "[i]n early 2003, and Alger Inc. wholesaler held a series of conversations with Veras' principals about timing Alger Fund portfolios.  The Veras principals indicated that one of their requirements for investing in the Alger Fund was that

they be permitted to enter trades after 4:00 p.m. Specifically, Veras' principals informed the

Alger Inc. wholesaler that they needed until 4:30 p.m. to enter trades because their trading model

was based on a 'signal' from the close of the futures market (e.g., 4:15 p.m.). Thus, Veras'

principals asked whether they could place orders to trade shares of Alger Fund portfolios after

the futures market closed but still receive that day's NAV. The Alger Inc. wholesaler

transmitted this request to Connelly. On February 21, 2003, the wholesaler sent an e-mail to

Connelly indicating that Veras had 'asked for a 4:30 cutoff and I said it wouldn't be a problem.

Any problem?' Connelly replied 'No.' The wholesaler then sent an e-mail to Veras indicating

that '[w]e got everything you wanted including a 4:30 cutoff.' During the approximately six

months the late trading arrangement was in effect, Veras executed trades after 4:00 p.m. E.T. on

approximately eighteen occasions. In each instance, the late trades received that day's NAV."

64.     During their call, Larson told Bailey that VCM and, by extension, Veras Offshore,

had little legal risk from the investigation, as they had not engaged in any illegal or fraudulent

trading practices.

65.     Larson's statements to Bailey were false, misleading, and failed to disclose

material information. Larson knew and did not tell Bailey, among other things, that he,

McBride, VIP and VCM had used deceptive tactics to evade restrictions on market timing, that

he, McBride, VIP and VCM had caused and aided and abetted illegal late trading, and that there

was tremendous risk to the VCM, and by extension Veras Offshore, from the SEC and NYAG

investigations.

66.     In reliance on Defendants' representations and omissions alleged above, Gottex

did not immediately redeem its shares of Veras Offshore. Gottex had the right to do so on ten

days' written notice, under a letter agreement from VIP dated July 28, 2003. Pursuant to that

letter agreement, ninety percent of the redemption proceeds were required to be paid within 30 days after the end of the 10 day notice period, with the balance due as soon as the next complete audit for Veras Offshore was finalized.

### DEFENDANTS' MISREPRESENTATIONS REGARDING
### ALLOCATION OF AMOUNTS HELD BACK BY DEFENDANTS

67.    In September, 2003, Defendants informed Gottex that Veras Offshore intended to hold back from investors and not distribute to them a portion of Veras Offshore's assets. Defendants informed Gottex that the hold-back was in connection with VIP's cooperation with the SEC and NYAG investigations.

68.    In a telephone call on about September 25, 2003, Larson informed Bailey that the total amount of the hold-back had been based on an estimated $77 million in trading profits since the inception of the fund.  In that call, Larson stated that the SEC and NYAG were very aware of the issue of the timing of the investors' investments and the need for any applicable fines or sanction payments to be attributed equitably among investors.  Larson explained that the $77 million fund profit hold-back which had been applied was done taking this into account, and that the hold-back was therefore determined based on when each investor made its investments in the fund. This was very important to Gottex because, as alleged above, Gottex's investments in the fund came much later than other investors, indeed in August and September of 2003, only a few weeks before Veras Offshore ceased its investment operations due to the regulatory investigations.

69.    Gottex did not believe that any amounts for any payment regarding the SEC and NYAG should be held back from Gottex (because, among other reasons, Gottex did not know about the Defendants' clandestine late trading and deceptive acts to circumvent restrictions on excess market timing).  Nonetheless, Gottex relied upon Larson's statements that the profit-based

hold-back was to be allocated equitably, and that Defendants understood that the equitable way to make such an allocation was based on profits. In particular, given the very short time that Gottex had been an investor in the funds, its total "paper profits" from its $25,000,000 worth of investments in Veras Offshore had been only approximately $94,500.

70.     From the very first conference calls in September, 2003 in which Defendants and their counsel revealed to Gottex that they intended to hold back some funds from investors in connection with negotiations with the SEC and NYAG, Defendants represented to Gottex that any sanction payments to the SEC would be allocated proportionately to profits made by the investors. Gottex therefore understood that the amount of Gottex's money that Veras Offshore, VIP/VIG might seek to use on account of SEC sanction payments would be limited to a portion of Gottex's "paper profits" from the investments. Defendants, through Larson and through counsel, repeatedly stated to Gottex and assured Gottex that, in Defendants' view, the fair and equitable allocation of any such payments was proportionate to profits and limited by the amount of profits.

71.     Notwithstanding Defendants' longstanding and often repeated assurances that any payments in connection with settling the SEC and NYAG investigations would be apportioned based on profits, VIP/VIG, Larson and McBride, in about January 2006, wrongfully charged its investors for the VCM, VIP, settlement with the SEC and NYAG based on a pro-rata allocation, rather than based on profits made by each investor. As a result of their inequitable conduct, Defendants have taken over $1.5 million from Gottex, even though Gottex's "paper profits" from its investment in Veras Offshore amounted to only approximately $94,500.

72.     On information and belief, more than 95% of the profits made by VCM and/or Veras Offshore since their inception was made prior to Gottex's brief investment in Veras

Offshore.  Therefore, the longer-term shareholders received far more benefit from VCM's investment activities than did Gottex.

73.   As noted in the Defendant's response to Gottex's due diligence questionnaire, Larson and McBride each had "a substantial percentage of their liquid net worth invested in [VCM and/or Veras Offshore]."  On information and belief, Larson and McBride's personal investments in VCM and/or Veras Offshore significantly pre-dated Gottex's investments.  On information and belief, as a result, Larson and McBride made substantial "paper profits" from their investments in VCM and/or Veras Offshore.

74.   On information and belief, the Defendants' allocation of the SEC sanction pro-rata rather than based on profits disproportionately benefited longer-term investors, most notably Larson and McBride.

75.   On information and belief, Defendants allocated the SEC sanction pro-rata rather than based on profits so that Larson and McBride could protect their own personal investments in VCM and/or Veras Offshore at the expense of innocent, shorter-term investors such as Gottex.

76.   At no time did Larson or McBride disclose to Gottex that, in reneging on their earlier repeated assurances that apportionment of the SEC sanction would be profit-based, Larson and McBride would personally benefit disproportionately to the detriment of shorter-term investors such as Gottex.

### DEFENDANTS IMPOSED A FORCED REDEMPTION OF FUND SHARES

77.   In late September 2003, Gottex gave notification to Defendants seeking to redeem its shares of Veras Offshore for their full value.  However, in furtherance of Defendants' scheme to shift the burden of their own SEC and NYAG sanctions to their innocent investors, Veras Offshore, VIP/VIG wrongfully failed to honor Gottex's notice of redemption.

78.     Instead, in or about October 2003, the Directors of Veras Offshore purported to impose a compulsory redemption of all shares of Veras Offshore.  This included the purported compulsory redemption of all of Gottex's shares of Veras Offshore.

79.     Defendants continue to refuse to pay Gottex the full value to which Gottex is entitled for redemption of its shares in Veras Offshore.

80.     Because Gottex's redemption of shares was compelled by Veras Offshore's Directors and/or because Gottex had not yet been paid full value for its interests in Veras Offshore, Gottex is deemed a current interest holder in Veras Offshore for purposes of standing and capacity to bring this action derivatively on behalf of Veras Offshore.

<u>DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS</u>

81.     Gottex will adequately and fairly represent the interests of Veras Offshore and VCM in enforcing and prosecuting their rights.

82.     The Directors of Veras Offshore consist of McBride, Larson, and another individual who is also a principal VIP.

83.     Veras Offshore is a general partner of VCM.

84.     VIP/VIG, Larson, McBride, and the Directors of Veras Offshore approved the scheme to shift to their innocent investors the burden of the SEC and NYAG sanctions for which Larson, McBride and VIP were liable.  As part of this scheme, VIP/VIG, Larson, McBride and the Directors of Veras Offshore allocated those costs to innocent investors in a manner unrelated to consideration of profits earned.

85.     A majority of the Directors of Veras Offshore (McBride and Larson) were personally jointly and severally liable for the SEC and NYAG sanctions described herein and yet did not contribute to payment of those amounts.  Larson and McBride and the other Director of

24

Veras Offshore are principals of VIP, which was also jointly and severally liable for payment of the SEC and NYAG sanctions described herein and yet did not contribute to payment of those amounts. Larson and McBride and the other Director of Veras Offshore, as the principals of VIP therefore directly benefited from their decision to have VCM (and, by extension, its "feeder funds," including Veras Offshore) pay the sanctions ordered by the federal regulators and the NYAG.

86.    The actions of Larson, McBride, and VIP, each of whom stood in a fiduciary relationship to both VCM and Veras Offshore, operated as "fraud on the minority" interest holders of those funds in that they effectively appropriated for their benefit millions of dollars of the funds' money to satisfy their own joint and several obligations.

### FIRST CLAIM FOR RELIEF
### VIOLATION OF SECTION 10(b) OF
### THE EXCHANGE ACT AND RULE 10b-5

87.    Gottex repeats and realleges each of the allegations contained in paragraphs 1 through 86 inclusive, as if fully set forth herein.

88.    As set forth above, Veras Offshore, VIP/VIG, Larson, and McBride, and each of them, engaged in a deliberate plan, scheme, and course of conduct that was intended to defraud and mislead Gottex as to the true nature and value of its investments in Veras Offshore, and to induce Gottex to acquire securities of Veras Offshore in August and September 2003, as described herein.

89.    Veras Offshore, VIP/VIG, Larson, and McBride, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to misrepresent, omit to disclose, and conceal material information about the true nature and value of securities of Veras

Offshore as set forth herein in connection with Gottex's acquisitions of Veras Offshore securities.

90.    Veras Offshore, VIP/VIG, Larson, and McBride, acted intentionally and/or recklessly, individually and in a conspiracy with each other, in order to induce Gottex to purchase equity interests in Veras Offshore in August and September 2003. The statements and information provided during the due diligence process and otherwise prior to Gottex's purchases were materially false and/or misleading and failed to disclose material facts and information necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading. In the course of their fraudulent scheme, the Defendants made numerous statements of material facts and/or omitted to state material facts which they knew, or were reckless in failing to know, were false and misleading or were rendered misleading and inaccurate by the failure to disclose material information. The Defendants knew and intended that Gottex would rely on their misrepresentations and omissions of material fact and knew that they were material and essential to Gottex's decisions to make the investments.

91.    Veras Offshore, VIP/VIG, Larson, and McBride, had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

92.    At the time the foregoing representations were made, and the misleading information provided, Gottex believed them to be true and complete in all material respects, and acted reasonably and justifiably in reliance thereon to its detriment by purchasing the securities of Veras Offshore in August and September 2003. If Gottex had known of the falsity of the

material facts represented to it, or of the information intentionally withheld from it, it would not have purchased those securities.

93.     By virtue of the foregoing, Veras Offshore, VIP/VIG, Larson, and McBride, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder in that they: (a) employed devices, schemes and artifices to defraud, (b) made untrue statements of material facts or omitted to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading, and/or (c) engaged in acts, practices and a course of business that operated as a fraud or deceit upon Gottex.

94.     Gottex has suffered actual damages as a result of Defendants' wrongful conduct in an amount to be determined at trial.

SECOND CLAIM FOR RELIEF
CONTROL PERSON LIABILITY UNDER
SECTION 20(a) OF THE EXCHANGE ACT

95.     Gottex repeats and realleges each of the allegations contained in paragraphs 1 through 86 inclusive, as if fully set forth herein.

96.     VIP/VIG, Larson, and McBride, acted as controlling persons of Veras Offshore within the meaning of Section 20(a) of the Exchange Act for the reasons alleged herein.  By virtue of their operation and management control of Veras Offshore's business and involvement in the fraud committed upon Gottex as alleged herein, VIP/VIG, Larson and McBride each had the power to influence and control and did influence and control, directly or indirectly, the decision making and actions of Veras Offshore, including the content and dissemination of the various statements alleged above.  VIP/VIG, Larson and McBride had the ability to prevent the issuance of the statements alleged to be false and misleading or cause such statements to have been corrected.

97.     In particular, VIP/VIG, Larson and McBride each had direct and supervisory involvement in the operations of Veras Offshore and, therefore, is presumed to have had the power to control or influence the particular statements and transactions giving rise to the federal securities law violations alleged herein, and exercised the same.

98.     As set forth above, each of the Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by their acts and omissions as alleged in this Complaint. By virtue of their positions as controlling persons, VIP/VIG, Larson and McBride each are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Gottex suffered damages in connection with the purchase of securities of Veras Offshore.

THIRD CLAIM FOR RELIEF
COMMON LAW FRAUD

99.     Gottex repeats and realleges each of the allegations contained in paragraphs 1 through 86 inclusive, as if fully set forth herein.

100.    As set forth above, Veras Offshore, VIP/VIG, Larson, and McBride, and each of them, engaged in a deliberate scheme to defraud and mislead Gottex into purchasing and not timely redeeming shares of Veras Offshore. In the course of their fraudulent scheme, Veras Offshore, VIP/VIG, Larson, and McBride knowingly made numerous false and misleading statements of material fact to Gottex that they knew to be untrue at the time and/or omitted to state material facts that they knew should have been disclosed and which rendered information provided to Gottex false and misleading.

101.    Veras Offshore, VIP/VIG, Larson, and McBride each, and acting together in an unlawful conspiracy, acted intentionally and/or recklessly to deceive Gottex and for the purpose of inducing Gottex into making and not timely redeeming equity investments in Veras Offshore.

Defendants knew and intended that Gottex rely on their misrepresentations and/or omissions of material fact and knew that they were material and essential to Gottex's decisions to make and not timely redeem the investments.

102.    At the time the foregoing representations were made, Gottex believed them to be true and acted reasonably and justifiably in reliance thereon to their detriment by purchasing and not timely redeeming the securities of Veras Offshore.  If Gottex had known of the falsity of the material facts represented by the Defendants, or of the information intentionally withheld, Gottex would not have purchased those securities and/or would have timely redeemed them.

103.    As a direct and proximate result of the fraud and deceit engaged in by Veras Offshore, VIP/VIG, Larson, and McBride, Gottex has suffered actual damages in an amount to be determined at trial.

104.    The conduct of Veras Offshore, VIP/VIG, Larson, and McBride caused the Plaintiffs actual injury, was wrongful, without justification or excuse, and contrary to generally accepted standards of morality.  These acts and omissions were committed intentionally by Veras Offshore, VIP, Larson, and McBride, with actual malice, and with reckless, wanton, and willful disregard of Plaintiffs' rights, representing inequitable and unjustifiable conduct against which the public needs protection from similar acts.

FOURTH CLAIM FOR RELIEF
NEGLIGENT MISREPRESENTATION

105.    Gottex repeats and realleges each of the allegations contained in paragraphs 1 through 86 inclusive, as if fully set forth herein.

106.    As set forth above, Veras Offshore, VIP/VIG, Larson, and McBride, and each of them: made numerous representations in the course of their business; made numerous representations in transactions in which Defendants had pecuniary interests; supplied false

29

information for the guidance of Gottex in its business; did not exercise reasonable care or competence in obtaining or communicating the information to Gottex; and Gottex suffered pecuniary loss by justifiably relying on the representations.

107.   Gottex has suffered actual damages as a result of Defendants' wrongful conduct in an amount to be determined at trial.

FIFTH CLAIM FOR RELIEF<br>TEXAS SECURITIES ACT ART. 581-33

108.   Gottex repeats and realleges each of the allegations contained in paragraphs 1 through 86 inclusive, as if fully set forth herein.

109.   As set forth above, Veras Offshore, VIP/VIG, Larson, and McBride, and each of them, offered or sold securities by means of untrue statements of material facts or omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, in violation of Art. 581-33A(2) of the Securities Act of Texas.

110.   VIP/VIG, Larson, and McBride, and each of them, directly or indirectly controlled a seller or issuer of a security and, pursuant to Art. 581-33F(1), is liable under Art. 581-33A(2) jointly and severally with the seller or issuer to the same extent as if he or it were the seller or issuer.

111.   Veras Offshore, VIP/VIG, Larson, and McBride directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aided a seller or issuer of a security and, pursuant to Art. 581-33F(2), is liable under Art. 581-33A(2) jointly and severally with the seller or issuer to the same extent as if he were the seller or issuer.

112.   Gottex has suffered actual damages as a result of Defendants' wrongful conduct in an amount to be determined at trial.

30

## SIXTH CLAIM FOR RELIEF
## BREACH OF FIDUCIARY DUTIES

113.    Gottex repeats and realleges each of the allegations contained in paragraphs 1 through 86 inclusive, as if fully set forth herein.

114.    VIP/VIG, Larson and McBride, and each of them, owe and owed to Gottex the fiduciary duties of loyalty, candor, and due care in the management and administration of Veras Offshore and in the use and preservation of the property and assets of Veras Offshore.  Further, VIP/VIG, Larson and McBride, and each of them, owe and owed a duty to Gottex not to place their own personal self-interest above the best interests of Gottex.

115.    As alleged above, VIP/VIG, Larson and McBride, and each of them, breached his or its fiduciary duties to Gottex.

116.    VIP/VIG, Larson and McBride breached their fiduciary duties to Gottex by, among other things: (i) making the misrepresentations and/or omissions described in this Complaint, (ii) improperly allocating the costs of the SEC and NYAG sanctions to investors pro rata rather than based upon profits made so that Larson and McBride's personal investments would not be as significantly adversely impacted by such allocation, and (iii) refusing to honor Gottex's redemption request in furtherance of their scheme to shift the burden of their own SEC and NYAG sanctions upon Gottex.

117.    Gottex has suffered actual damages as a direct and proximate result of VIP/VIG, Larson and McBride's wrongful conduct in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF
## CIVIL CONSPIRACY

118.    Gottex repeats and realleges each of the allegations contained in paragraphs 1 through 86 inclusive, as if fully set forth herein.

119.    VIP/VIG, Larson and McBride entered into an agreement or agreements or combinations with each other to accomplish by common plan the illegal acts described in this Complaint and by their actions demonstrated the existence of an agreement and combination.

120.    VIP/VIG, Larson and McBride by their actions have manifested actual knowledge that tortious or illegal acts were planned and their intention to aid in such acts.

121.    VIP/VIG, Larson and McBride maliciously and intentionally conspired, combined and agreed with one another to commit the unlawful acts alleged in this Complaint or to commit acts by unlawful means proximately causing injury and damages to Gottex for which they are jointly and severally liable.

122.    As a direct and proximate cause of the wrongful conduct alleged above, Gottex was damaged in an amount to be determined at trial.

### EIGHTH CLAIM FOR RELIEF
### BREACH OF CONTRACT

123.    Gottex repeats and realleges each of the allegations contained in paragraphs 1 through 86 inclusive, as if fully set forth herein.

124.    Gottex had a contractual relationship with VIP/VIG and Veras Offshore with respect to its redemption of shares of Veras Offshore and the appropriate management Veras Offshore.  Among other things, that contract contained an implied covenant of good faith and fair dealing.

125.    VIP/VIG and Veras Offshore breached that contract, including its implied covenant of good faith and fair dealing by (i) refusing to honor Gottex's redemption notice on the terms set forth in the July 28, 2003 letter agreement, (ii) suspending payment for the forced redemption of Gottex's shares of Veras Offshore so that Defendants could pay the regulatory

sanctions for their own wrongful conduct from those proceeds, and (iii) allocating the costs of

the SEC and NYAG sanctions pro-rata rather than based on profits so that Larson and McBride

could protect their own investments in VCM and/or Veras Offshore at the expense of innocent

shorter-term investors such as Gottex.

126.    Gottex has suffered actual damages as a result of Defendants' wrongful conduct in

an amount to be determined at trial.

### NINTH CLAIM FOR RELIEF
### UNJUST ENRICHMENT

127.    Gottex repeats and realleges each of the allegations contained in paragraphs 1

through 86 inclusive, as if fully set forth herein.

128.    VIP, Larson and McBride received a benefit by using Gottex's investment funds

to pay VIP, Larson and McBride's own obligations under the sanctions imposed by federal

regulators and the NYAG.

129.    Justice and equity require that VIP, Larson and McBride not be allowed to retain

those benefits at the expense of Gottex.

130.    Justice and equity require that the portion of Gottex's investment funds that VIP,

Larson and McBride unjustly took to pay for their obligations under the sanctions imposed by

federal regulators and the NYAG be awarded to Gottex.

### TENTH CLAIM FOR RELIEF
### DERIVATIVE CLAIMS FOR BREACH OF FIDUCIARY DUTY
### ON BEHALF OF VERAS OFFSHORE AND VCM

131.    Gottex repeats and realleges each of the allegations contained in paragraphs 1

through 86 inclusive, as if fully set forth herein.

132.    VIP/VIG, Larson and McBride, and each of them, owe and owed to Veras

Offshore and VCM the fiduciary duties of loyalty, candor, and due care in the management and

administration of Veras Offshore and VCM and in the use and preservation of the property and assets of Veras Offshore and VCM. Further, VIP/VIG, Larson and McBride, and each of them, owe and owed a duty to Veras Offshore and VCM not to waste the assets of Veras Offshore and VCM and not to place their own personal self-interest above the best interests of Veras Offshore and VCM.

133. To discharge those duties, VIP/VIG, Larson and McBride, and each of them, were required to exercise prudent and loyal supervision over the management, policies, practices, controls, and financial and business affairs of Veras Offshore and VCM.

134. As alleged above, VIP/VIG, Larson and McBride, and each of them, breached his or its fiduciary duties to Veras Offshore and VCM by causing VCM and Veras Offshore to incur the cost of paying the entirety of the more than $36 million SEC/NYAG sanction, even though (i) VIP, Larson and McBride were jointly and severally liable for that sanction, (ii) VIP, Larson and McBride were the ones who caused the conduct that the SEC and NYAG found to have been unlawful and that formed the basis for the regulatory settlements, and (iii) VIP, Larson and McBride pocketed many millions of dollars in profits and fees based on such conduct.

135. As a direct and proximate result of the wrongful conduct alleged above, Veras Offshore and VCM suffered actual damages in an amount to be determined at trial.

## ELEVENTH CLAIM FOR RELIEF
### DERIVATIVE CLAIM FOR UNJUST ENRICHMENT

136. Gottex repeats and realleges each of the allegations contained in paragraphs 1 through 86 inclusive, as if fully set forth herein.

137. VIP/VIG, Larson and McBride received a benefit in the profits, management fees, incentive fees, and other fees they earned as a result of their unlawful conduct as described in this Complaint.

138.    Justice and equity require that VIP/VIG, Larson and McBride not be allowed to retain those profits, management fees, incentive fees, and other fees at the expense of Veras Offshore or VCM or their shareholders.

139.    Justice and equity require that VIP/VIG, Larson and McBride's unlawfully earned profits, management fees, incentive fees, and other fees be awarded to Veras Offshore and VCM for the benefit of their shareholders.

WHEREFORE, Gottex prays for judgment as follows:

A.   Awarding monetary damages against all Defendants, individually, jointly, or severally, in favor of Gottex, for all losses and damages suffered as a result of the conduct alleged in this Complaint, including punitive damages where appropriate, together with interest thereon,

B.   Rescinding Gottex's investments in securities of Veras Offshore and ordering Defendants to return to Gottex the entire amount it invested in securities of Veras Offshore, plus interest,

C.   Awarding monetary damages against VIP, VIG, Larson and McBride, individually, jointly, or severally, in favor of Veras Offshore and VCM, for all losses and damages suffered as a result of the conduct alleged in this Complaint, including punitive damages where appropriate, together with interest thereon,

D.   Ordering VIP, VIG, Larson and McBride to disgorge all management, incentive, and other fees and compensation they earned in connection with management of Veras Offshore and VCM,

E.  Awarding Gottex the fees and expenses incurred in this action, including

reasonable allowance of fees for Gottex's attorneys and experts, and

F.  Granting such other and further relief as the Court may deem just and

proper.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Gottex hereby demands a trial by jury

for all issues so triable.

New York, New York
January **23**, 2007

Respectfully submitted,

NIXON PEABODY LLP

By: _____

Adam B. Gilbert (AG0890)
437 Madison Avenue
New York, NY  10022
(212) 940-3000


George Skelly, Esq.
Andrew Hachey, Esq.
NIXON PEABODY LLP
100 Summer Street
Boston, MA  02110
(617) 345-1000

Attorneys for Plaintiff