UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------X

GVA MARKET NEUTRAL MASTER LIMITED,

    Plaintiff,

  -against-         07 Civ. 0519

VERAS CAPITAL PARTNERS OFFSHORE
FUND, LTD., VERAS INVESTMENT     OPINION
PARTNERS, LLC, VERAS INVESTMENT
GROUP, LP, KEVIN D. LARSON, and
JAMES R. MCBRIDE,

     Defendants,

and

VERAS CAPITAL PARTNERS OFFSHORE
FUND, LTD., and VERAS CAPITAL
MASTER FUND,

   Nominal Defendants.

-------------------------------------X



A P P E A R A N C E S:

   Attorneys for Plaintiffs

   NIXON, PEABODY LLP
   437 Madison Avenue
   New York, NY  10022
   By:  Adam B. Gilbert, Esq.

   NIXON, PEABODY LLP
   100 Summer Street
   Boston, MA  02119
   By:  George Skelly, Esq.
     Andrew Hachey, Esq.

Attorneys for Defendants and Nominal Defendants

SPEARS & IMES LLP
51 Madison Avenue
New York, NY 10010
By: David Spears, Esq.

RICHARDS KIBBE & ORBE LLP
701 8th Street, NW
Washington, DC 20001-3727
By: Paul A. Leder, Esq.
David W.T. Daniels, Esq.

**Sweet, D.J.**

Defendants and Nominal Defendants Veras Capital
Partners Offshore Fund, Limited ("VCP Offshore" or the "Fund"),
Veras Capital Master Fund (the "Master Fund"), Veras Investment
Partners, LLC ("VIP"), Veras Investment Group, LP ("VIG" or,
collectively with the other entity defendants, "Veras"), Kevin
D. Larson ("Larson"), and James R. McBride ("McBride")
(collectively, the "Defendants") have moved pursuant to Fed. R.
Civ. P. 12(b)(6) to dismiss with prejudice the Amended Complaint
filed by Plaintiff GVA Market Neutral Master Limited ("Gottex").
For the reasons set forth below, the motion is granted.

This case arises out of investments of $25 million in
VCP Offshore, a Cayman Islands hedge fund, by Gottex, a
sophisticated British Virgin Islands hedge fund.

Gottex invested in VCP Offshore in August and
September of 2003, based upon the Fund's investment strategy,
which involved market timing of mutual funds. VCP Offshore
closed its operations shortly after Gottex made its investment,
in the wake of announcements of industry-wide investigations
into market timing by the Office of the New York Attorney
General ("NYAG") and the U.S. Securities and Exchange Commission

("SEC"). VCP Offshore is alleged to have held back, at that time, a portion of Gottex's investment to pay any fines or sanctions in connection with these investigations. The regulatory investigations involving Veras were ultimately resolved through settlement in December 2005, when Veras and certain affiliated entities and individuals paid $36.2 million (the "Settlement Expense"). Though most of Gottex's investment was returned, a portion of that Settlement Expense was allocated to Gottex. The essence of the dispute concerns the allocation of the Settlement Expense and the propriety of the holdback of part of the Gottex investment pending the Fund's windup.

## I.   Prior Proceedings

Gottex filed its complaint on January 23, 2007.   The Defendants filed a motion to dismiss the complaint on April 26, 2007.   Gottex filed an amended complaint on June 18, 2007.   The Defendants again moved to dismiss and the motion was heard and marked fully submitted on November 28, 2007.

## II.  The Amended Complaint

The Amended Complaint makes the following allegations:

VCP Offshore is a hedge fund organized as a Cayman Islands Exempted Company with its offices on Grand Cayman Island. Am. Compl. ¶ 13. VCP Offshore is a so-called "feeder fund" which sold shares to offshore subscribers but invested its assets through the Master Fund, a Texas general partnership. Id. ¶¶ 14, 21. VCP Offshore was managed by an investment manager, VIG, a Texas limited partnership, which, in turn, allegedly has a general partner, VIP, and two limited partners, Larson and McBride. Id. ¶ 12.

Gottex is a British Virgin Islands entity whose sole beneficial shareholder is Gottex Value Added Fund Limited ("Gottex VAF"), a hedge fund that invests assets in other hedge funds (i.e., a "fund of funds"). Id. ¶ 8. Gottex VAF alleges that at the time of its investment in VCP Offshore, Gottex VAF was managed by a Bermuda company, Gottex America Limited, and that a New York-based corporation, Gottex Fund Management Limited, "supported" Gottex America Limited with its investment-related activities on behalf of Gottex and Gottex VAF. Id.

Gottex invested in VCP Offshore in two tranches: $17 million on August 1, 2003, and $8 million on September 1, 2003.

Id. ¶¶ 70-71.[1] VCP Offshore pursued an investment strategy known as mutual fund market timing, in which traders seek to earn a profit through frequent purchases and sales of shares in a mutual fund company in order to benefit from stale prices or other pricing discrepancies. Id. ¶ 18, 22.

Gottex made its investment in VCP Offshore after receiving two documents: a January 1, 2003 Private Offering Memorandum ("Offering Memorandum") and written responses to Gottex's due diligence questionnaire ("Questionnaire Responses") that had been prepared by "Larson and McBride, on behalf of themselves, VIP, and [VCP] Offshore." Id. ¶¶ 45, 52. Gottex alleges that in the offering materials and during Gottex's due diligence, Defendants made a number of material misrepresentations and omissions to Gottex concerning their investment process. Id. ¶¶ 45-61. According to Gottex, Veras failed to disclose that it engaged in late trading, which the Amended Complaint defines as "the illegal practice whereby an order to purchase or sell mutual fund shares is submitted after the U.S. stock market close (4:00 [p.m.] Eastern Standard Time) is treated as eligible for and receives the [net asset value per share] computed as of the market close." Id. ¶¶ 26, 29, 53.

---

[1] Gottex made those two investments through an intermediary who was the actual subscriber of the shares.

4

Gottex alleges that Defendants also failed to disclose that Veras market timed through "deceptive acts" designed to avoid detection of its trades by mutual funds and thereby evade any trading restrictions. Id. ¶¶ 24, 53, 59. Gottex further alleges that Veras did not disclose the risk that its investment strategy might be found by regulators to involve unlawful conduct or its knowledge that the NYAG had been investigating late trading and market timing "well before" Gottex made its investment. Id. ¶¶ 30, 50-51.

According to Gottex, in early September 2003, Larson called J.P. Bailey, a Senior Investment Partner of Gottex America Limited, and Larson admitted that he had been aware for several months that an NYAG investigation of late trading and market timing had been pending and conceded that Defendants had not disclosed this information to Gottex prior to its investments in the Fund. Id. ¶¶ 30, 73. Larson allegedly told Bailey that the NYAG was investigating both late trading and "kickbacks to the [mutual] funds in order to secure 'capacity' to receive preferential trading terms," id. ¶ 74, and denied that Veras engaged in either practice, id. ¶ 75. Also in September 2003, Defendants informed Gottex that Veras was cooperating with the NYAG and SEC investigations, and that such cooperation would include withholding certain assets of VCP

Offshore from distribution back to investors. Id. ¶ 87. On or about September 25, 2003, Larson advised Bailey that the total amount of the hold-back would be an estimated $77 million. Id. ¶ 88.

Following its investigation into the Defendants' practices, in December 2005, the SEC made extensive findings, including that the Master Fund, VIP, Larson, and McBride had engaged in fraudulent market timing and illegal late trading, and that they had willfully violated the anti-fraud provisions of federal securities laws (Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a), and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5) and had aided and abetted and caused violations of the federal securities laws prohibiting late trading (Rule 22c-1(a) under the Investment Company Act of 1940, 17 C.F.R. § 270.22c-1). The SEC ordered the Master Fund, VIP, Larson and McBride (as well as another Veras fund), jointly and severally, to pay $35,554,903 in disgorgement and $645,585 in prejudgment interest. Larson and McBride were each ordered to pay a civil penalty of $750,000, and were barred from serving as investment advisers or working for mutual funds for eighteen months. Id. ¶¶ 33-34.

6

Gottex alleges that it was initially told that VCP Offshore would allocate the Settlement Expense based on profits earned by investors over the life of VCP Offshore, and was later told that the management company, not VCP Offshore, would likely bear the expense of any settlement. Id. ¶¶ 90, 93-94. In January 2006, despite assurances that were made through July 2005, id. ¶ 91-95, VCP Offshore decided to allocate the Settlement Expense among all investors pro rata based on the size of their account balances rather than an allocation based upon profits. Id. ¶ 96. This resulted in the withholding of approximately $1.5 million from Gottex, which had "paper profits" of only $94,500 from its investment in VCP Offshore. Id. Gottex asserts that it therefore paid a disproportionately large share of the Settlement Expense, and that the allocation was made to protect the personal investments of Larson and McBride. Id. ¶¶ 99-101.

In late September 2003, Gottex had sought to redeem its shares at full value, but its notice of redemption was not honored by Veras Offshore. Id. ¶ 103. In or about October 2003, Veras sought to compulsorily redeem all shares of VCP Offshore, id. ¶ 104, however, according to Plaintiffs, "Defendants continue to refuse to pay Gottex the full value to which Gottex is entitled for redemption of its shares," id. ¶

105. According to Gottex, because of representations made on behalf of the Defendants, its injury occurred no earlier than January 2006, when Gottex learned of the pro rata allocation determination. Id. ¶¶ 107-114.[2]

In its Amended Complaint, filed on January 23, 2007, Gottex alleges three types of claims. First, in Counts One and Two, Gottex alleges claims under the federal securities laws, specifically Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b), 78t(a), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Id. ¶¶ 121-32. Second, in Counts Three through Nine, Gottex alleges direct claims for violations of common law or state statutes, including common law fraud, id. ¶¶ 133-38, negligent misrepresentation, id. ¶¶ 139-42, violations of the Texas Securities Act, ¶¶ 143-47, civil conspiracy, id. ¶¶ 148-53, breach of contract, id. ¶¶ 154-61, promissory estoppel, id. ¶¶ 162-67, and unjust enrichment, id. ¶¶ 168-173. Third, in Counts Ten and Eleven, Gottex asserts derivative claims for breach of fiduciary duty and unjust enrichment on behalf of VCP Offshore and the Master Fund. Id. ¶¶ 174-182.

---

[2] Gottex argues alternatively in its opposition papers on this motion that the injury occurred no earlier than December 2005, when Veras entered into the regulatory settlements and, as a result, the value of Gottex's shares fell below the purchase price. Pl.'s Mem. in Opp. at 10-11.

## III. The 12(b)(6) Standard

In considering a motion to dismiss pursuant to Rule
12(b)(6), Fed. R. Civ. P., the Court construes the complaint
liberally, "accepting all factual allegations in the complaint
as true, and drawing all reasonable inferences in the
plaintiff's favor," Chambers v. Time Warner, 282 F.3d 147, 152
(2d Cir. 2002) (citing Gregory v. Daly, 243 F.3d 687, 691 (2d
Cir. 2001)), although mere "conclusions of law or unwarranted
deductions" need not be accepted. First Nationwide Bank v. Gelt
Funding Corp, 27 F.3d 763, 771 (2d Cir. 1994) (quotation marks
and citation omitted).

On a motion to dismiss, "[t]he issue is not whether a
plaintiff will ultimately prevail but whether the claimant is
entitled to offer evidence to support the claims." Villager
Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995)
(quoting Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S. Ct. 1683,
40 L. Ed. 2d 90 (1974)). In other words, "'the office of a
motion to dismiss is merely to assess the legal feasibility of
the complaint, not to assay the weight of the evidence which
might be offered in support thereof.'" Eternity Global Master
Fund Ltd. v. Morgan Guar. Trust Co. of New York, 375 F.3d 168,
176 (2d Cir. 2004) (quoting Geisler v. Petrocelli, 616 F.2d 636,

9

639 (2d Cir. 1980)). However, "to survive dismissal, the
plaintiff must provide the grounds upon which his claim rests
through factual allegations sufficient 'to raise a right to
relief above the speculative level.'" ATSI Communs., Inc. v.
Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Bell
Atlantic Corp. v. Twombly, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d
929 (2007)); see also Iqbal v. Hasty, 490 F.3d 143, 157-58 (2d
Cir. 2007). "Once a claim has been stated adequately, it may be
supported by showing any set of facts consistent with the
allegations in the complaint." Twombly, 127 S. Ct. at 1969.

With regard to motions to dismiss based on a statute
of limitations defense, "[a]lthough the triggering of inquiry
notice is an issue 'often inappropriate for resolution on a
motion to dismiss,' where 'the facts needed for determination of
when a reasonable investor of ordinary intelligence would have
been aware of the existence of fraud can be gleaned from the
complaint and papers . . . integral to the complaint, resolution
of the issue on a motion to dismiss is appropriate.'" Masters
v. GlaxoSmithKline, 271 Fed. Appx. 46, 48 (2d Cir. 2008)
(citation omitted); see also Dodds v. Cigna Secs., Inc., 12 F.3d
346, 352 n.3 (2d Cir. 1993) (noting the "vast number of cases in
this circuit resolving [notice] issues at the pleading
stage.")).

10

## IV. **The Federal Securities Claims Are Barred by the Statute of Limitations**

### *A. Notice*

Since the passage of the Sarbanes-Oxley Act of 2002, Pub. L. No. 107-204, § 804(a), 116 Stat. 745, 801 (2002), codified in part at 28 U.S.C. § 1658(b), complaints asserting claims under Rule 10b-5 and Section 20(a) must be filed no later than the earlier of (1) two years after discovery of the facts constituting the alleged violation or (2) five years after the alleged violation. See 28 U.S.C. § 1658(b) (setting forth the statute of limitations for "claim[s] of fraud, deceit, manipulation, or contrivance of a regulatory requirement concerning the securities laws"); see also Dodds, 12 F.3d at 350 n.2 (holding that Section 20 claims are governed by Section 1658(b) "[b]ecause Section 20 merely creates a derivative liability for violations of other sections of the Act").

Under this statute of limitations, discovery includes constructive or inquiry notice, as well as actual notice. Newman v. Warnaco Group, Inc., 335 F.3d 187, 193 (2d Cir. 2003) (citing Rothman v. Gregor, 220 F.3d 81, 96 (2d Cir. 2000)). The two-year limitations period "applicable to discovery of the violation begins to run after the plaintiff 'obtains actual

knowledge of the facts giving rise to the action or notice of
the facts, which in the exercise of reasonable diligence, would
have led to actual knowledge.'" LC Capital Partners, LP v.
Frontier Insurance Group, Inc., 318 F.3d 148, 154 (2d Cir. 2003)
(quoting Kahn v. Kohlberg, Kravis, Roberts & Co., 970 F.2d 1030,
1042 (2d Cir. 1992)). A duty of inquiry arises "[w]hen the
circumstances would suggest to an investor of ordinary
intelligence the probability that she has been defrauded,"
circumstances otherwise known as "storm warnings." Id. (quoting
Dodds, 12 F.3d at 350). A plaintiff need not be on notice of
the entire fraud to trigger the duty of inquiry. Dodds, 12 F.3d
at 352; see also Salinger v. Projectavision, Inc., 972 F. Supp.
222, 229 (S.D.N.Y. 1997). "If the investor makes no inquiry
once the duty arises, knowledge will be imputed as of the date
the duty arose." LC Capital Partners, 318 F.3d at 154. "[I]f
the investor makes some inquiry once the duty arises, [the
court] will impute knowledge of what an investor, 'in the
exercise of reasonable diligence, should have discovered'
considering the fraud . . . and in such cases the limitations
period begins to run from the date such inquiry should have
revealed the fraud." Id. (internal citation omitted). "Thus,
'whether the securities fraud claim of a plaintiff who receives
storm warnings is time barred turns on when, after obtaining
inquiry notice, the plaintiff in the exercise of reasonable

12

diligence, should have discovered the facts underlying the [defendant's] alleged fraud.'" Shah v. Meeker, 435 F.3d 244, 249 (2d Cir. 2006) (quoting Levitt v. Bear Stearns & Co., 340 F.3d 94, 101 (2d Cir. 2003)) (emphasis in original).

In assessing whether "storm warnings" were sufficient to put the investor on inquiry notice, courts examine any publicly available financial, legal, or other information, including news articles or the filing of other lawsuits alleging fraud against the defendants. See Dietrich v. Bauer, 76 F. Supp. 2d 312, 343-44 (S.D.N.Y. 1999); cf. Shah v. Meeker, 435 F.3d 244, 249 (2d Cir. 2006) ("Information contained in articles in the financial press may trigger the duty to investigate.") (collecting cases). For purposes of inquiry notice, a sophisticated investor such as Gottex "may be presumed to know of information in the public domain." In re Integrated Resources Real Estate Ltd. P'ships Sec. Litig., 815 F. Supp. 620, 640 (S.D.N.Y. 1993).

The essence of Gottex's Rule 10b-5 theory is that Veras knew that there was material regulatory risk at the time that Gottex made its investment, but deliberately concealed that risk from Gottex. Am. Compl. ¶¶ 49-61. Gottex contends that it did not have actual notice of the facts giving rise to its

13

claims until at least December 2005, when "the SEC made extensive findings, including that [the Defendants] had engaged in fraudulent market timing and illegal late trading." Am. Compl. ¶¶ 33-41; Pl.'s Mem. in Opp. at 11.

However, accepting the allegations in the Amended Complaint as true, by October 2003, Gottex knew that (i) it had been deceived, as Larson had conceded that "Defendants had known that the NYAG had been investigating late trading and market timing at mutual funds for at least three to four months," Am. Compl. ¶ 73, and that "Defendants had not previously disclosed this information to Gottex in June or July when Gottex was conducting due diligence before investing in Veras Offshore or in August prior to Gottex's second ($8,000,000) investment in Veras Offshore," id.; (ii) Veras was involved in the investigation and was withholding investor funds to satisfy "any applicable fines or sanction payments" in connection with the NYAG and SEC investigations, id. ¶¶ 87-88; (iii) Gottex believed that a holdback of its funds was wrongful, id. ¶ 89; and (iv) Gottex had lost the use of its investment, as Veras had disregarded Gottex's instructions to return its entire investment, id. ¶¶ 104-105. Therefore, by October 2003, Gottex had actual knowledge of the facts giving rise to the action that it now alleges. Because Gottex had actual notice, the statute

of limitations started to run on the date of that notice, even if Gottex later received reassurances that no fraud was committed. See, e.g., Wolf v. Gruntal & Co., Civ. No. 91-426-P-H, 1994 WL 44318, at *2 (D. Me. Feb. 9, 1994) (finding that plaintiff could not rely on his broker's assurances regarding stock's stability where he had actual notice that broker's prior statements were misrepresentations).

Moreover, even if the Court were to accept Gottex's contention that it did not have actual notice of the facts giving rise to its claims until December 2005, there were sufficient storm warnings by the close of 2003 to place Gottex on inquiry notice of its claim. In addition to the allegations described above, there were numerous other widely disseminated pieces of information "sufficiently suggestive of the probability" of the very fraud claim asserted in the Amended Complaint. In re Polaroid Sec. Litig., 465 F. Supp. 2d 232, 243 n.2 (S.D.N.Y. 2006) (citing In re Global Crossing, Ltd. Sec. Litig., 313 F. Supp. 2d 189, 202 (S.D.N.Y. 2003)). Indeed, beginning on October 16, 2003, and continuing for months thereafter, numerous news articles, press releases and lawsuits

appeared containing the exact allegations of wrongdoing by Veras that Gottex now includes in its Amended Complaint:[3]

- On October 16, 2003, James Connelly, a former vice chairman and chief mutual fund officer at Fred Alger & Company, Inc., pleaded guilty in New York state court to one felony count of tampering with evidence in connection with an investigation into illegal trading practices in the mutual funds industry. The NYAG complaint, which Gottex cites in its Amended Complaint at ¶31, alleges that Connelly tried to conceal an email "inquiring whether an Alger client known as 'Veras' could continue to place trades with Alger as late as 4:30 p.m." and tried to conceal his knowledge of "late trading by Veras" from outside counsel. Decl. of David W.T. Daniels ("Daniels Decl."), Ex. 6.

  That same day, Connelly settled an SEC administrative proceeding in which the SEC found that Connelly committed securities fraud by, among other things, approving "sticky asset" agreements that permitted select hedge fund customers, including Veras, to time certain Alger mutual funds. Daniels Decl., Ex. 7 at ¶ 9 ("For example, in February 2003, . . . Connelly approved an arrangement whereby Veras Investment Partners ("Veras") could time $50 million in the Alger Fund in exchange for a $10 million buy and hold position in the smallcap fund. In July 2003, Veras was granted an additional $30 million of capacity in exchange for an additional $12 million buy and hold position.").

  Also on October 16, 2003, the NYAG and the SEC each issued press releases that announced the enforcement actions against Connelly and mentioned Veras by name. Daniels Decl., Exs. 8-9.

- On October 16, 2003, VIP itself issued a press release announcing that it had received subpoenas from the NYAG and the SEC "in connection with an ongoing investigation into trading in mutual fund securities." Daniels Decl., Ex. 10.

---

[3] Consideration of these materials on a motion to dismiss is appropriate. In re NYSE Specialists Sec. Litig., 405 F. Supp. 2d 281, 299 (S.D.N.Y. 2005); In re Merrill Lynch & Co. Research Reports Sec. Litig., 272 F. Supp. 2d 243, 250-51 & n.5 (S.D.N.Y. 2003).

- On October 16 and 17, 2003, national and international
  press, including The Wall Street Journal, The New York
  Times, The Houston Chronicle and The Financial Times,
  reported on the Connelly enforcement actions and
  specifically mentioned Veras. See, e.g., Daniels Decl.,
  Exs. 11-14 ("Former Fred Alger Official Pleads Guilty to
  Obstruction," The Wall Street Journal; "Fund Executive
  Pleads Guilty to Tampering," The New York Times; "Spitzer
  aiming at local firm; Veras Investment is subpoenaed in
  investigation," Houston Chronicle; and "Alger man set to
  admit email claims," The Financial Times). Many of the
  newspapers also reported VIP's announcement that it had
  received subpoenas from the NYAG and the SEC in connection
  with their investigations.

- On October 31, 2003, a purported class action complaint
  against VIP and others was filed in this Court on behalf of
  investors in Alger mutual funds alleging securities fraud
  in connection with market timing in Alger funds. Demayo v.
  Alger Small Portfolio, et al., No. 03 Civ. 8627 (HB).
  Daniels Decl., Ex. 15.[4]

- On November 25, 2003, Federated Investors, a mutual fund
  complex, announced the results of its internal review into
  trading practices, stating that Veras had placed trades
  after 4:00 p.m. on at least 15 occasions. Daniels Decl.,
  Ex. 16. Federated Investors' press release was reported by
  The Wall Street Journal and The Washington Post. Daniels
  Decl., Exs. 17-18.

- On December 17, 2003, a purported derivative complaint was
  filed in the U.S. District Court for the Western District
  of Pennsylvania on behalf of several Federated Investor
  fund entities against VIP and others alleging that Veras
  engaged in late trading and illegal market timing. Feder

---

[4] Five other lawsuits naming VIP as a defendant were also filed in this Court: Henzel
v. Alger Small Portfolio, et al., No. 03 Civ. 8747 (HB) (filed Nov. 5, 2003); Buhs v.
Fred Alger Management Inc., et al., No. 03 Civ. 8959 (PKC) (filed Nov. 13, 2003);
Garfield v. Fred Alger Management Inc., et al., Case No. 03 Civ. 9239 (HB) (filed Nov.
20, 2003); Johnson v. Alger Small Portfolio, et al., No. 03 Civ. 9858 (HB) (filed Dec.
11, 2003); and Crocket v. Alger Small Portfolio, et al., No. 03 Civ. 9915 (HB) (filed
Dec. 12, 2003). One lawsuit was filed in the U.S. District Court for the Eastern
District of New York: Bernstein v. Fred Alger Management Inc., No. 03 Civ. 5958 (LDW)
(filed Nov. 24, 2003). Three lawsuits against VIP were filed in Massachusetts State
Court: Laufer v. Fred Alger, Case No. 04-0360-G (filed Jan. 27, 2004); Clain v. Fred
Alger, Case No. 04-0361 (filed Jan. 27, 2004); and Grant v. Fred Alger, Case No. 04-
1126-B (filed Mar. 15, 2004).

v. Federated Investors, Inc., No. 03 Civ. 01942 (GLL).
Daniels Decl., Ex. 19.[5]

- On December 19, 2003, in an article entitled "Hedge Fund
  May Be Next to Pay in Fund Scandal," TheStreet.com
  reported, "Veras Investment Partners, a Texas hedge fund
  that securities regulators contend engaged in improper
  trading of mutual fund shares, has set aside more than $100
  million to cover the cost of a possible settlement with
  state and federal regulators." The article continued,
  "Veras, which is being investigated by New York Attorney
  General Eliot Spitzer and the Securities and Exchange
  Commission, has not been charged with any wrongdoing [but]
  has been linked to possible improper and illegal trading in
  shares of several mutual fund companies." Daniels Decl.,
  Ex. 20.

- On December 22, 2003, in an article titled, "Veras
  Reportedly Set Aside $100M for Probe Costs," Dow Jones
  Newswire reported that Veras had "been implicated in a
  mutual-fund probe," that it had been "linked to market
  timing and late trading of mutual funds in complaints" and
  that "regulators have filed against Fred Alger Management,"
  and that Veras had "revealed in October that it had
  received a subpoena from both the SEC and Spitzer's
  office," as well as that Federated Investors "acknowledged
  that its employees accepted late trades from Veras."
  Daniels Decl., Ex. 21.

Such "storm warnings" impose a duty on a plaintiff to
inquire diligently into whether it has a claim. Dodds, 12 F.3d
at 352. There are no allegations in the Amended Complaint that
Gottex made any attempt to ask Defendants about (i) the
allegations in the October 16, 2003, Connelly enforcement

---

[5]Three other suits against VIP were filed in that court relating to these same
allegations: Chang v. Federated Investors, Inc., No. 04 Civ. 439 (GLL) (filed Mar. 19,
2004); Linnock v. Federated Investors, Inc., No. 04 Civ. 440 (GLL) (filed Mar. 19,
2004); and Soto v. Federated Investors, Inc., 04 Civ. 441 (GLL) (filed Mar. 19, 2004).
A similar lawsuit against VIP was also filed in the U.S. District Court for the
District of Maryland: Mehta v. Federated Investors, Inc., No. 04 Civ. 672 (JFM) (filed
Mar. 5, 2004).

18

actions that Veras had engaged in late trading and "sticky asset" arrangements; (ii) the November 25, 2003, Federated Investors press release stating that Veras engaged in late trading; (iii) the allegations in the numerous class action and derivative complaints filed against Veras starting in November 2003; or (iv) any of the numerous press reports describing the same activity that Gottex now includes in its Amended Complaint. As Gottex does not allege that it inquired into any of these matters, the statute of limitations started to run when its duty of inquiry arose, no later than the close of 2003.

Gottex refers to an alleged telephone call in early September 2003 in which Larson denied to Gottex that Veras engaged in late trading. Am. Compl. ¶¶ 73-75. The Amended Complaint alleges a second telephone call on October 12, 2003, between Gottex and Larson in which Larson said that Veras had not done anything illegal. Am. Compl. ¶ 81. These calls, however, took place before the filing of the Connelly actions on October 16, 2003, and the storm warnings that followed. The apparent contradiction between Larson's alleged "assurances" and the subsequent allegations by the SEC and the NYAG should, additionally, have put Gottex on notice of its claim. Cf. In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig. II, 851 F. Supp. 556, 569 (S.D.N.Y. 1994) ("The conflicts

between the numerous oral assertions allegedly made to the
Plaintiffs and the written materials received by the Plaintiffs
would have alerted the ordinary investor . . . that there was
something amiss that should be investigated."); In re Merrill
Lynch Ltd. P'ships Litig., 7 F. Supp. 2d 256, 275 (S.D.N.Y.
1997) (noting that "once a plaintiff becomes aware of direct
contradictions between the defendant's representations and other
materials available to the plaintiff, plaintiffs are thereby
left with reason to be suspicious of defendant, and it is no
longer reasonable for them to defer to the defendant's
representations.") (citation omitted).

            In addition to these two conversations, Gottex
describes certain communications between Gottex and Veras about
the status of Veras' ongoing settlement dialogue with the SEC
and the NYAG. See Am. Compl. ¶ 82 ("Defendants were in the
process of 'educating the SEC' on Veras' strategy"); id. ¶ 83
("Pees [a lawyer representing Veras] reported to Bailey that he
had met with the regulators and that the tone of the meeting was
excellent."); id. ¶ 84 ("Pees stated that he believed 'Veras
made significant progress educating' the SEC and NYAG with
respect to Veras' investment process'"); id. ¶ 85 ("Defendants
had explained . . . differences [in market timing models] to the
regulators."). Gottex asserts that these communications

constituted inquiry, and, furthermore, that "Defendants'
counsel's assurances and statements regarding the investigation
and whether Defendant[s'] trading practices had been within
mutual fund parameters," constituted "reliable words of comfort"
sufficient to dissipate any duty to inquire. Pl.'s Mem. in Opp.
at 12-14 (citing LC Capital Partners, 318 F.3d at 155).

"[R]eassuring statements will prevent the emergence
of a duty to inquire or dissipate such a duty only if an
investor of ordinary intelligence would reasonably rely on the
statements to ally the investor's concern." LC Capital
Partners, 318 F.3d at 155. The statements cited by Gottex
express optimism about a positive outcome to the investigations,
but such "mere expressions of hope" are insufficient to
dissipate Gottex's duty to inquire. Id. at 156. Even if these
were outright denials of the specific practices being
investigated, they do not fulfill Gottex's duty of inquiry and
were insufficient to toll the running of the statute of
limitations. See, e.g., In re Merrill Lynch & Co. Research
Reports Sec. Litig., 289 F. Supp. 2d 429, 433 (S.D.N.Y. 2003)
("A plaintiff's duty to inquire is not dissipated merely because
of a defendant's denial of wrongdoing."); see also Great Rivers
Co-op. of Southeastern Iowa v. Farmland Inds., Inc., 120 F.3d
893, 898 (8th Cir. 1997) (holding that "self-serving statements

21

about the invalidity of the suit do not . . . negate the other
pertinent information" that otherwise put plaintiff on inquiry
notice); Lenz v. Associated Inns & Restaurants Co. of Am., 833
F. Supp. 362, 376 n.12 (S.D.N.Y. 1993) (holding that reassuring
statements did not relieve plaintiff of duty to undertake
reasonable inquiry).

Given the volume and nature of the information
available to Gottex regarding Veras' potential involvement in
illegal conduct, particularly in light of Gottex's
sophistication, Gottex was on inquiry notice, and the statute of
limitation started to run, no later than the close of 2003. See
Lenz, 833 F. Supp. at 376 ("[T]he investor's sophistication
affects the extent to which a court may properly conclude that a
particular event should have influenced the investor to
undertake an inquiry.").

## B. *Injury*

Gottex contends that it did not suffer any injury
until December 2005 or January 2006, therefore, its claims did
not accrue, and the statute of limitations did not start to run,
prior to that date. It was in January 2006 that Gottex alleges

22

it first learned that Veras would be allocating the Settlement
Expense among its investors on a pro rata basis and, as a
result, Gottex would lose some of its principal investment.
According to Gottex, prior to January 2006, it believed, based
on representations made by Veras, that its portion of the
Settlement Expense would not exceed the amount of its profits.
Am. Compl. ¶¶ 97, 107-114.

However, in a securities fraud action, the injury
occurs "at the time an investor enters . . . a transaction as a
result of material misrepresentations."  Lenz, 833 F. Supp. at
370; see also CSI Investment Partners II, L.P. v. Cendant Corp.,
180 F. Supp. 2d 444, 457-59 (S.D.N.Y. 2001) (holding that, for
statute of limitations purposes, the injury in a Section 10(b)
action occurs at the time of plaintiffs' entry into purchase
agreement, not on later date when plaintiffs failed to receive
expected payment).  Gottex alleges that if it "had known of the
falsity of the material facts represented to it, or the
information intentionally withheld from it, it would not have
purchased [the VCP offshore securities]."  Am. Compl. ¶ 126.
Therefore, Gottex suffered its injury on August 1 and September
1, 2003, the dates on which it made its investment.

The relevant limitations period expires two years
after the date when the plaintiff learns or should have learned
of the deception. See CSI Investment Partners II, L.P., 180 F.
Supp. 2d at 461 (noting that the statute of limitations runs
from the relevant period following "the discovery of *the facts*
*constituting the violation*," not following "the discovery of *the*
*facts constituting the cause of action*") (citing Lampf, Pleva,
Lipkind, Prupis & Pettigrow v. Gilbertson, 501 U.S. at 360 &
n.6, 364 & n.9) (emphasis added).

That Gottex may not have been able to quantify the
magnitude of its loss until January 2006 is irrelevant. See
e.g., CSI Investment Partners II at 461; Butala v. Agashiwala,
916 F. Supp. 314, 317 (S.D.N.Y. 1996) ("The plaintiffs' argument
that their cause of action did not accrue until their damages
were ascertainable is premised on a misunderstanding of the
difference between when an injury occurs and when the damages
resulting from that injury are fully quantifiable.").

Moreover, according to the Amended Complaint, as early
as 2003, Gottex understood that it would likely pay at least
some portion of the $94,500 of trading profits that it had
earned toward any regulatory settlement. Am. Compl. ¶¶ 89-90,
103-105. Contrary to Gottex's assertion that only loss of a

24

portion of its principal investment constituted an injury, here, its loss of profits represented an injury as well. See Osofsky v. Zipf, 645 F.2d 107, 114 (2d. Cir. 1981) ("[T]he purpose of section 28(a) is to compensate civil plaintiffs for economic loss suffered as a result of wrongs committed in violation of the 1934 Act, whether the measure of those compensatory damages be out-of-pocket loss, the benefit of the bargain, or some other appropriate standard."); see also Barrows v. Forest Labs., Inc., 742 F.2d 54, 60 (2d Cir. 1984) ("The holding of Osofsky . . . [turns] on the distinction between damages that are speculative and those which are certain."), cited in Commercial Union Assurance Co. PLC v. Milken, 17 F.3d 608, 614 (2d Cir. 1994); Panos, 880 F. Supp. at 178 (citing, inter alia, Osofsky for the proposition that "although securities plaintiffs are normally restricted to an out-of-pocket recovery, when benefit-of-the-bargain damages can be measured with reasonable certainty and those damages are traceable to a defendant's fraud, courts are free to award them.").

In addition, after Veras refused to return the full amount of Gottex's investment in 2003, Gottex could have sued for out-of-pocket damages, based on the difference in the price it paid for VCP Offshore securities and their true value at the time. See Panos v. Island Gem Enterprises, Ltd., N.V., 880 F.

Supp. 169, 176 (S.D.N.Y. 1995) (stating that courts generally
restrict awards to "out-of-pocket" damages for Rule 10b-5
claims, i.e., "the difference between the price paid for the
security and its true value absent the fraud on the date of the
transaction"). Gottex has alleged that there was a difference
between the price paid and the securities' true value, as it
contends that the defendants fraudulently concealed a material
liability, i.e., "a significant risk of disgorgement of some of
the profits and/or other monetary sanctions." Am. Compl. ¶ 69;
see also Am. Compl. ¶ 123 (stating that Defendants "engaged and
participated in a continuous course of conduct to misrepresent,
omit to disclose, and conceal material information about the
true nature and value of securities of Veras Offshore . . . in
connection with Gottex's acquisition of Veras Offshore
securities.").


Alternatively, Gottex could have sued to recover
rescissionary damages the amount that it alleges was wrongfully
withheld when Veras refused to return the full amount of its
investment. See, e.g., Clark v. John Lamula Investors, Inc.,
583 F.2d 594, 604 (2d Cir. 1978) (permitting plaintiff to
recover rescissionary damages for Rule 10b-5 claim); Chasins v.
Smith, Barney & Co., 438 F.2d 1167, 1173 (2d Cir. 1971) (holding
that plaintiff was entitled to sue under Rule 10b-5 for the

difference between the price and the value received from the sale of the security "where, as here, the evil is not the price at which [plaintiff] bought but the fact of being induced to buy"); Kronfeld v. Advest, Inc., 675 F. Supp. 1449, 1455-56 (S.D.N.Y. 1987) (finding that plaintiff could sue under Rule 10b-5 for the difference between the purchase price and resale value of the securities).

Gottex's citation to Dura Pharmaceuticals, Inc. v. Broudo, 544 U.S. 336 (2005), to establish its contention that it suffered no loss until 2005 is unavailing. In Dura, the Supreme Court held that an allegation of an artificially inflated purchase price was alone insufficient to meet the requirements for adequately pleading loss causation in a securities fraud action. Dura, 544 U.S. at 346. However, Dura did not address facts such as those here where a plaintiff alleged both having received less for its securities than what it paid and a causal relationship between that loss and an underlying fraud. In addition, unlike the plaintiff in Dura, Gottex could not have merely resold its securities into a public market to recover its full investment. Moreover, Dura does not change whether Gottex could sue for out-of-pocket or recessionary damages in 2003, as Dura did not purport to disturb long-standing rules regarding available remedies under Rule 10b-5. See, e.g., In re Cigna

Corp. Sec. Litig., 459 F. Supp. 2d 338, 354 (E.D. Pa. 2006) ("Dura Pharmaceuticals has not changed existing law concerning the measurement of economic loss and damages in securities cases.").

Having concluded that Gottex's federal claims are barred by the statute of limitations, the Court need not address the alternative grounds for dismissal under 12(b)(6) asserted by Defendants.

## V.   The State and Common Law Claims Are Dismissed

Because the Gottex federal claims are dismissed as barred by the statute of limitations, pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to exercise supplemental jurisdiction over the remaining common law and state statutory claims. Although the Court, in its discretion, may exercise supplemental jurisdiction over these non-federal claims, "in general, where the federal claims are dismissed before trial, the state claims should be dismissed as well." Olle v. Columbia Univ., 332 F. Supp. 2d 599, 620 (S.D.N.Y. 2004) (quoting Marcus v. AT&T Corp., 138 F.3d 46, 57 (2d Cir. 1998)). As this case is still at the pleading stage and no discovery has yet taken place, with due consideration of concerns of judicial economy,

convenience and fairness, Nowak v. Ironworkers Local 6 Pension Fund, 81 F.3d 1182, 1191 (2d Cir. 1996), it is appropriate to follow that practice in this instance.

## VI.  Conclusion

The Defendants' motion to dismiss the federal claims on statute of limitations grounds is granted, and supplemental jurisdiction over the common law and state claims is declined.

It is so ordered.

New York, N.Y,
September 29 , 2008

ROBERT W. SWEET
U.S.D.J.